**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| ANTONIO JOSE COOKS, | |
| Plaintiff, | No. 4:19-CV-00151-JAJ-SBJ |
| vs. | |
| DEAN NAYLOR; TANYA BISHOP; RYAN DREYER; LAEKKON MCDANIEL; BRYCE PERRY; DARRAN RITCHIE; CHRIS WITT; and MICHAEL WADE, | **ORDER** |
| Defendants. | |

This case comes before the Court pursuant to Defendants' Motion for Summary Judgment, filed February 24, 2020. [Dkt. No. 35] Plaintiff responded in resistance on March 23, 2020. [Dkt. No. 42] Defendants replied on March 30, 2020. [Dkt. No. 28] For the reasons that follow, Defendants' motion is **GRANTED**.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Initial Background and Parties

Plaintiff Antonio Cooks ("Cooks") was incarcerated at the Muscatine County Jail from April 7, 2019 to September 16, 2019.[1] Defendant Captain Dean Naylor ("Naylor") was the Jail Administrator for the Muscatine County Jail. Defendant Tanya Bishop ("Bishop") was the Food Service Manager for the Muscatine County Jail. Defendants Laekkon McDaniel ("McDaniel"), Bryce Perry ("Perry"), Darran Ritchie ("Ritchie"), Chris Witt ("Witt"), and Ryan Dreyer ("Dreyer") were correctional officers for the Muscatine County Jail. Defendant Michael Wade ("Wade") was a deputy for the Muscatine County Sheriff's Office serving as a courthouse security officer at the Muscatine County Courthouse.

Cooks was booked into the jail at approximately 1:45 a.m. on April 7th, and correctional officers informed him of the Muscatine County Jail's Inmate Rule and Information Book ("Rule

---

[1] Unless otherwise noted, Undisputed Material Facts are taken from Docket Numbers 35-1 (Defendants' Motion for Summary Judgment), 42 (Plaintiff's Response), and 49 (Defendants' Response to Plaintiff's Statement of Additional Material Facts).

Book"). Cooks identified his religious preference for a kosher diet to the correctional officer who assisted him during his booking, but, per the Rule Book, he was aware that the correctional officer lacked the ability to approve his request. Cooks was also aware of the jail procedures because he had requested and been approved for a kosher diet during a 2015 incarceration at the same jail. Cooks was placed in administrative segregation for approximately 40 hours due to a concern regarding ties in his hair.

During the time he was in administrative segregation, jail staff offered him meals from the regular menu at each mealtime. Cooks admits he chose to fast rather than eat the non-kosher meals and states that this is required by his religious beliefs. Specifically, he believed the meals violated his kosher diet because they contained white bread and were served on trays which had likely been used to serve non-kosher food. When Cooks told jail staff why he would not eat the meals, he was told that he needed to file an Inmate Request Form so that the Food Service Manager could approve his diet. Cooks claims he was unable to complete the request form and was not given a paper form until the third day. He was placed in the general population unit at 5:30 p.m. on April 8, 2019. He waited until 11:20 a.m. on April 9, 2019 to use a TurnKey Kiosk to submit an inmate request for a Jewish Kosher diet. At that time, he stated that he had not eaten anything since the time of his booking. Approximately half an hour later, the Food Service Manager spoke with Cooks and approved him for a kosher diet. He began receiving kosher meals at with lunch that day and continued to consume them through the rest of his incarceration. He also ordered kosher items off the commissary menu.

Cooks filed this lawsuit on May 20, 2019, and on July 1, 2019, this Court entered an Initial Review Order dismissing several of Cooks' claims pursuant to 28 U.S.C. § 1915A and denying his motion for a preliminary injunction. On September 24, 2019, following the appearance of counsel on his behalf, Cooks filed an Amended Complaint alleging five statutory and constitutional claims arising from the conditions of his confinement at the Muscatine County Jail. On October 21, 2019, Cooks filed a corrected amended complaint after realizing several defendants were erroneously omitted from the amended complaint.

### B. Muscatine County Jail Procedures and Cooks' Use of the Grievance System

The Rule Book governs inmates' conduct and outlines procedures for interacting with jail administration. The jail also maintains a grievance system through which inmates may request relief from jail administrators. Inmates may submit grievances on paper or through a TurnKey

Kiosk. A correctional officer reviews each grievance and issues a decision on paper or through a TurnKey message. Inmates may appeal an adverse decision to the Assistant Jail Administrator; at all times relevant to this case, that individual was Lieutenant McCleary. Inmates may then appeal denials of relief to the County Sheriff. The sheriff must respond within 10 days. Instructions for this grievance review process are detailed on the grievance decision form, and Cooks received these instructions no later than May 2, 2019. He admits that he read the instructions and was familiar with the grievance process.

Pursuant to the Rule Book, inmates must request a special religious diet by "provid[ing] Jail Staff with this information when booked in, and specifically detail[ing] the special needs on an Inmate Request Form to the Food Service Manager." [Dkt. No. 35-1 ¶ 38 (quoting Appx. 46, Inmate Rule and Info. Book at 18) (alteration in Dkt. 35-1)] These requests are generally approved, and inmates are required to conform with the described procedure to ensure a reliable and orderly review process by the Food Service Manager. Defendants, and the Rule Book, state that Inmate Request Forms are available to inmates upon request and may be submitted to jail staff on a daily basis. Further, Naylor states that inmates may also submit requests through the TurnKey Kiosk system. Requests made through any means other than an Inmate Request Form or a TurnKey Kiosk are not valid, and correctional officers do not have authority to approve an inmate's special dietary request. Cooks disputes that he had opportunity to submit an Inmate Request Form because he had restricted access to the jail kiosk while he was on administrative segregation during the first 40 hours of his incarceration. Cooks states he had difficulty using the TurnKey Kiosk due to an injury but does not allege he asked for help in operating the kiosk. Inmates in the general population have access to the kiosks at scheduled intervals, including between 4 p.m. and 8:30 p.m. but he provides nothing

Cooks frequently availed himself of the grievance process—during 2019, he filed at least 24 grievances related to the conditions of his confinement. Some grievances were relevant to this case, some were not; Cooks appealed many of these, but he abandoned most of them before exhausting his appeal rights. The first grievance that Cooks appealed to the Jail Administrator was grievance number 702019287, alleging he had been served frozen rice. Captain Naylor issued a decision regarding that grievance on May 24, 2019 via TurnKey message. Naylor states that Cooks did not appeal this decision to the sheriff. Cooks disputes that, "Mr. Cooks states that he did appeal the grievance to the sheriff. Mr. Cooks was not the custodian of his jail file. He does not know

what happened to that grievance, or where it may be found." On July 18, 2019, Cooks filed grievance number 702019505. On September 1, 2019, Cooks appealed this grievance to the sheriff, the final level of the appeals process. Although the grievance process does not allow an inmate to file a grievance directly with the sheriff, Cooks "went over Naylor's head" and filed a "grievance" directly with the sheriff on or about June 11, 2019.

### C. Details of the Muscatine County Jail Kosher Diet and Cooks' Religious Diet

The Muscatine County Jail maintains a kosher menu consisting of a two-week rotation of scheduled meals. It was approved by a state-licensed dietitian in 2013 and contains more than 2400 calories each day. Since the dietitian's approval, only minor changes and substitutions have been made in the two-week food schedule. Inmates approved for a kosher diet are served this menu. Kosher meals are prepared separately from the jail's non-kosher foods using separate utensils and containers pursuant to a set of preparation guidelines approved by an Orthodox Jewish Rabbi. Kosher diet inmates may also order kosher items from the jail commissary menu. Cooks identifies as a Hebrew Israelite, and he adheres to a special diet as part of his faith. He refers to this diet as "Jewish Kosher" or "Ovo Lacto Pesco Vegetarian," and it generally prevents him from eating red meat or unleavened bread. Additionally, he must not eat meat and dairy in the same meal or use dinnerware which has previously touched forbidden foods. Packaged foods marked with a kosher symbol are permissible. Cooks agrees that all the foods on the jail's kosher diet are kosher with the exception of white bread, which he believes is not kosher.

### D. The Courthouse Incident

On June 7, 2019, Cooks was in the custody of defendants Perry, Ritchie, and Witt in the law library of the Muscatine County Courthouse awaiting a scheduled court appearance in his underlying criminal case. Cooks was bound with a chain restraint at the wrists, waist, and ankle. A court security officer, Deputy Wade, was also present. The law library was being used as a temporary holding area for incarcerated defendants, but it is adjacent to a public hallway and is not locked. While waiting Cooks was waiting in the library, the court entered an order continuing his hearing. When Cooks was notified of this, he stood up and asked to see the judge. The correctional officers declined to let him do so because no litigant is permitted to address the court without a scheduled hearing.

Cooks then walked away from the correctional officers and into the occupied public hallway of the courthouse. The correctional officers told him to stop, saying "Wait, Cooks. Cooks,

wait." Officer Perry grabbed the back of Cooks' shirt and said, "I'm going to tell you one more time: stop." Cooks began to taunt Perry, yelling, "What are you going to do, beat my ass?" and "Ain't nobody going to fuck with me." When Cooks began to yell, Deputy Wade told Cooks, "Let's go, out," reached for the sleeve of Cooks' shirt and began to direct him out of the courthouse. Cooks disputes what happened next, but Defendants' Statement of Undisputed Material Facts is wholly supported by the video footage. *See Scott v. Harris*, 550 U.S. 372, 380–381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."). Cooks dropped to the ground and was vocally resistant to verbal instructions to get up. He remained supine and uncooperative while officers tried to lift him to his feet. (He claims he had sustained a back injury.) Members of the public were present in the hallway, and at least one gentleman had to move out of the way to avoid Cooks' conduct. While the officers were trying to bring Cooks to his feet, Cooks wrapped his legs and foot restraint around Officer Perry's left leg, causing him to begin to lose balance.

Deputy Wade viewed Cooks' attempt to entangle Perry as an act of aggression and a safety threat to the officers. He then placed his hand on Cooks' neck, attempting to administer a pain compliance tactic to a pressure point under Cooks' jaw for less than ten seconds. The video shows Cooks speaking with a normal volume and a forceful tone while Wade is in contact with his neck. While still entangled with Perry's leg, Cook said, "I don't care if I break it." Cooks only released Perry after Perry kicked and briefly stood on his foot. Cooks remained limp. Wade and Perry had to carry him several feet by his waist restraint and foot chains until he was safely removed from the building. Less than two minutes elapsed between the time Cooks entered the public hallway and when officers removed him from the courthouse. Approximately three minutes after that, Cooks was able to stand and walk on his own to a waiting jail van. He subsequently pled guilty to assaulting a law enforcement officer under Iowa Code § 708.3(a) in connection with the courthouse incident, barring his excessive force claim under the holding of *Heck v. Humphrey. See Heck v. Humphrey*, 512 U.S. 477 (1994). During the entire incident, all four officers were armed with their service weapons.

### E. Cooks' Allegations of Retaliation

Cooks alleges that defendants have retaliated against him by: providing inadequate

nutrition, improperly substituting non-kosher items on his meal tray, serving him cold or frozen meals, assaulting him at the courthouse on June 6, 2019, and filing false disciplinary reports against him. He admits that neither Naylor nor Bishop indicated to him that their menu choices were due to his religious expression, grievances, or his lawsuit. In regard to their denial of his request for bagels, he admits that Bishop told him they would be cost-prohibitive. Although he testified that his only evidence that his kosher diet was intended as retaliation is that he was given sliced bread that he was not supposed to receive, he maintains that the record contains other evidence of retaliation regarding his diet as described above. He admits that Bishop testified that: (1) her decisions regarding Cooks' menu were not motivated by his exercises of constitutional rights; (2) she never omitted, substituted, or froze any of his food in retaliation for his diet, grievances, or lawsuit; and (3) any deviations from his normal food service would have been unintentional. However, he claims that "her actions belie her words" because she submitted a "false disciplinary report" accusing Cooks of sharing his meals. He admits that he also received a disciplinary report from Sergeant McDaniel for reacting poorly to missing his mealtime. Cooks further admits that his suspicion as to Bishop and McDaniel's motives in writing the reports was merely conjunctural. Similarly, Cooks claims that "his perception that [the officers' actions at the courthouse] were retaliatory was based on the sum of his experience at the Muscatine County Jail."

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Med. Liab. Mut. Ins. Co. v. Alan Curtis L.L.C.*, 519 F.3d 466, 471 (8th Cir. 2008); *Kountze ex rel. Hitchcock Found. v. Gaines*, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."). In making this determination, the Court must examine the evidence in the light most favorable to the nonmoving party. *See HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir. 2007).

To survive a motion for summary judgment, a plaintiff must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins., et al.*, 536 F.3d 939, 944 (8th Cir. 2008) (internal

citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994) (internal citation omitted). "'[T]he substantive law will identify which facts are material.'" *Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 993 (N.D. Iowa 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Because Cooks has sued Defendants in their individual and official capacities, the Court must also apply qualified immunity analysis. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). "Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 496. As noted by the Eighth Circuit Court of Appeals, "[t]he Supreme Court has generously construed qualified immunity to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## III. ANALYSIS AND CONCLUSIONS

Defendants argue that this Court should grant summary judgment because: (1) Cooks failed to exhaust administrative remedies on all claims; (2) Cooks' religious dietary preference was wholly accommodated; (3) the diet was adequately nutritious; (4) Defendants' use of force was objectively reasonable; and (5) Cooks admits his retaliation claims are unfounded.

### A. Cooks Failed to Exhaust Administrative Remedies

This Court has federal-question jurisdiction over this case pursuant to the Prison Litigation Reform Act ("PLRA"), which states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(a). "[T]hat mandatory language means a court may not excuse a failure to exhaust, even to take such [special circumstances] into account." *Ross v. Blake*, 136 S.Ct. 1850, 1856–57 (2016). Exhaustion entails observing the "critical procedural rules" of the jail's formal grievance

procedure. *Muhammad v. Mayfield*, 933 F.3d 993, 1001 (8th Cir. 2019) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). If an inmate fails to appeal a grievance to the highest level of review or otherwise abandons a lower-level grievance response, they are foreclosed from suing on that complaint. *King v. Iowa Dep't of Corr.*, 598 F.3d 1051, 1053–54 (8th Cir. 2010). Only in the case that grievance procedures are not "capable of use" to obtain "some relief for the action complained of" is an inmate relieved of the exhaustion burden. *Ross*, 136 S.Ct. at 1859.

Plaintiff argues that because, "Every time Cooks filed a grievance or made a complaint, Cooks was told to stop complaining and that no changes would be made. Further . . . Cooks was subjected to retaliation for his complaints. Under these circumstances, Cooks has exhausted the 'available' remedies." [Dkt. No. 46. p.22 (citing *Ross*)] In *Ross*, the Supreme Court identified three rare circumstances under "an inmate's duty to exhaust 'available' remedies does not come into play." *Id*. at 1859–60. These are when the administrative scheme: (1) operates as a simple dead end, for example, a prison rule book directs inmates to an office that disclaims the ability to consider grievances; (2) is "so opaque that it becomes, practically speaking, incapable of use[,]" such as when the rules are "so confusing that . . . no reasonable prisoner can use them[;]" and (3) when prison leadership "thwart[s] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. Cooks admits that he filed this lawsuit before any of his grievances had even reached the penultimate decision-making level. He does not allege the type of dead-end, confusing, complex, or counterfeit grievance process that meets the criteria described in *Ross*. For these reasons, the Courts holds that Cooks did not exhaust administrative remedies as required by the PLRA. However, even if Cooks had exhausted available administrative remedies, the undisputed facts show that each of the claims also fails as a matter of law.

**B. Cooks' Religious Dietary Preference Was Wholly Accommodated and Nutritious**

Cooks alleges violations of his free expression rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He argues that his religious freedom was violation when jail officials "refused" to provide him with kosher meals during his first days of incarceration, when they did not alter the kosher menu to fit his requests, and when they gave him kosher meals that contained allegedly "non-kosher" white bread. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89–90 (1987). Under RLUIPA, jail officials cannot "substantial[ly] burden" an inmate's religious practices unless the

burden furthers "a compelling government interest" and is the least restrictive means possible. 42 U.S.C. § 2000cc-1(a). The inmate bears the burden of demonstrating that the challenged practice substantially burdens his religious exercise, and "[w]here an in image has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009); *see* 42 U.S.C. 2000cc-2(b).

The Ninth Circuit has held that requiring an inmate to "sign a piece of paper effectively to satisfy standing and exhaustion requirements is by no stretch a substantial burden . . . ." *Resnick v. Adams*, 348 F.3d 763, 768 n.6 (9th Cir. 2003). "Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and Courts should respect that expertise." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). To demonstrate a constitutional violation regarding the nutrition of his food, Cooks would need to show "that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Ingrassia v. Shafer*, 825 F.3d 891, 897 (8th Cir. 2016) (citing *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)).

Cooks admits that he was aware of proper jail procedure for requesting kosher meals, and he admits that he had access to a TurnKey Kiosk during his time in administrative segregation and in the general population. He claims that he could not access the Kiosk during his time in administrative segregation due to an unspecified injury. He alleges that the jail officers did not give him an Inmate Request Form when he verbally requested a kosher diet, but he does not allege that he asked for an Inmate Request Form. When Cooks entered the general population, he did not use the TurnKey Kiosk at the first opportunity, but instead waited until the next day to request his kosher diet following proper procedures. Once he made the proper request, jail staff saw to his request within half an hour. It is undisputed that the request process exists to provide an orderly way for each request to be reviewed and approved by the appropriate jail staff. It is further undisputed that the kosher diet was approved by a dietician, provided at least 2400 calories a day, and could be supplemented by kosher items from the commissary.

The Court holds that the delay in providing Cooks with a kosher diet did not substantially

burden the exercise of his religion. First, it is imperative that the Muscatine County Jail have a uniform system of inmate requests so that inmate needs can be addressed in an orderly and documented fashion and so that departments such as Food Services can plan how to order, prepare, and serve a variety of diets to the appropriate prisoners. Given that the Muscatine County Jail cannot anticipate what the dietary needs of its new inmates will be on any given day, it is not necessarily feasible for them to have multiple special diets available at all times. Requiring uniform notification from the inmates is an administrative necessity and protects the needs of both the jail and the inmates. Second, Cooks did not avail himself of the TurnKey Kiosks when in administrative segregation, nor did he avail himself of the TurnKey Kiosks when in the general population until his second day. Cooks' participation in the delay of his kosher diet significantly hampers his ability to claim that the jail substantially burdened the exercise of his religion. Once he followed the proper procedure, they accommodated his needs within half an hour. Third, the kosher diet was approved by a dietitian, provided at least 2400 calories a day, and could be supplemented by kosher commissary purchases. It was not nutritionally deficient. By requiring Cooks to use the Inmate Request Form or the TurnKey Kiosk to request his kosher diet, the Muscatine County Jail used the least restrictive means possible to further a compelling government interest in maintaining order and safety within the jail. The undisputed facts show that Cooks' free exercise of his religion was not substantially burdened under RLUIPA or the First Amendment and his claim fails as a matter of law. Even if Cooks' claim under RLUIPA did not fail, Defendants are entitled to qualified immunity because it was not clearly established that Cooks had a statutory or constitutional right to bypass the jail's administrative procedures to receive a near-immediate kosher diet.

### C. Defendants' Use of Force Was Objectively Reasonable

The Court makes two holdings as to Cooks' excessive force claims. First, that the officers' actions were objectively reasonable, and therefore the claim fails as a matter of law; and second, that the claim is barred by Supreme Court's holding in *Heck v. Humphrey*. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Finally, the Court notes that even if Cooks' excessive force claim did not fail or was not barred, the officers would be entitled to qualified immunity because Cooks did not establish a constitutional or statutory right to be free from excessive force while assaulting a correctional officer and being noncompliant with officers' reasonable requests.

The initial inquiry is whether the facts as established show that the officers' use of force

was objectively unreasonable and therefore in violation of Cooks' Fourteenth Amendment right as a pretrial detainee. *Kinglsey v. Hendrickson*, 135 S.Ct. 2466, 2472 (2015); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). To evaluate claims that officers used excessive force in violation of the Fourteenth Amendment, an objective reasonableness standard is used which questions "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396. The reasonableness of an officer's use of force is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This inquiry considers the "spilt-second decisions" that officers are often forced to make in "circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397. Circumstances relevant to the reasonableness of the officers' conduct include, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Parrish v. Dingman*, 912 F.3d 464, 467 (8th Cir. 2019) (internal quotation marks and citation omitted). The Eighth Circuit Court of Appeals has regularly upheld correctional officers' use of force against noncompliant inmates, including taking inmates to the ground, using a taser to subdue an inmate, and using an "arm-bar" takedown technique. *See id.* at 568; see also *Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017); *Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011).

Plaintiff argues that he is not required to exhaust remedies under the PLRA as to this claim because it does not relate to prison conditions. Inmate excessive force claims are governed by section 1997e(a), regardless of which aspect of incarcerated life is at issue. *Porter v. Nussle*, 122 S.Ct. 983, 992 (2002). Cooks does not escape the PLRA requirements because he had been transported outside the jail for a court hearing or because a Court Security Officer aided jail personnel in handling Cooks' outburst. *See Gibson v. Weber*, 431 F.3d 339 (8th Cir. 2005) (upholding dismissal for failure to exhaust with correctional officers and outside medical personnel as defendants). He further argues that material issues of fact preclude summary judgment, specifically Cooks' confusion regarding the cancelation of the hearing, the officers' "escalation" of the situation rather than "de-escalating" it, their refusal to "resolve Cooks' problem," Wade's

conduct with regard to his contact with Cooks' neck; Cooks' entanglement with Perry's legs; Cooks' purported back injury, and the officers' actions in carrying Cooks out of the courthouse. Cooks' confusion is not relevant to this issue—regardless of whether he was confused, it is undisputed that he was noncompliant with the officers' instructions. Nor is an assertion that the officers should have "de-escalated" the situation by solving Cooks' problem. Cooks did not give them a chance to do either because he moved into the hallway and began yelling. The rest of the alleged fact issues are directly contradicted by the video. Finally, Plaintiff argues that while he was noncompliant, his resistance did not justify the use of force at all.

The Court holds that the officers' conduct was entirely reasonable throughout the entire encounter at the jail. The incident is on video, and the video wholly establishes the facts as described by Defendants. When Cooks leaves the law library, he enters a public hallway and members of the public are very near him. His tone is belligerent, and he refuses to comply with officers' requests to halt. The threat to both the public and the officers was severe and imminent. Cooks swears and uses threatening language, and he purposely entangles himself with Perry's legs. He tells Perry that he doesn't care if he breaks Perry's leg. Cook is alert and speaking throughout the less-than-10 second period when Wade's hand was in contact with neck. The video shows the officers moving as a team to transport a noncompliant, threatening, and assaultive inmates out of a public area of the courthouse. They were armed with their service weapons but did not use or threaten to use the weapons during the incident. The officers used the minimum amount of force possible—employing their bodies tactically and leveraging Cooks' restraints—to restrain Cooks in order to protect the public and themselves. Once Cooks chooses to get up and walk to the prison van, they cease physical contact with him and allow him to walk alone to the van. The officers did nothing wrong. Their use of force was objectively reasonable, and Cooks' actions later resulted in his conviction for assaulting a law enforcement officer. The undisputed facts, as established by the video recording of the courthouse incident, demonstrate that the officers did not use excessive force during the encounter. The claim fails as a matter of law.

Furthermore, the claim is barred by the Supreme Court's holding in *Heck v. Humphrey*:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by

a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Because a judgment in his favor would necessarily imply the invalidity of Cooks' state-court guilty plea, this complaint cannot stand until such time as that conviction or sentence is invalidated.

### D. Cooks' Retaliation Claims Are Unfounded

Cooks' testimony regarding his retaliation claims is murky at best. In order to prevail on his constitutional retaliation claim, Cooks "must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (internal citation omitted). To demonstrate the third element, Cooks needs to show that "but for the retaliatory motive" the official would not have engaged in the alleged behavior. *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2016). Cooks testified that his retaliation accusations against Bishop and McDaniel were merely conjecture or suspicion on his part, and that his retaliation allegations against the correctional officers for the courthouse incident were a reaction to the sum of his experience at the jail rather than to anything specific. While one would certainly not expect any of the defendants at admit to retaliatory behavior, Cooks has not presented a scintilla of evidence to suggest any defendant had a retaliatory motive for any of the alleged behavior. Cooks simply has not generated a fact issue nor presented any evidence that the officials had a retaliatory motive for their actions. His claim fails as a matter of law.

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.

Upon the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk shall enter judgment in favor of Defendants and against Plaintiff.

**DATED** this 8th day of April, 2020.

_____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA